Argued February 25, peremptory writ allowed in part
March 22, opinion clarified April 14, 1965

# STATE EX REL SPRAGUE v. STRAUB

400 P. 2d 229
401 P. 2d 29

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for defendant. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Roy H. Shields,* Portland, argued the cause for relator. With him on the brief were George A. Rhoten and Fred H. Paulus, Salem.

Before MCALLISTER, Chief Justice, and SLOAN, O'CONNELL, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

SLOAN, J.

This petition for a writ of mandamus requests that we order the State Treasurer to return to the State's

general fund certain money accumulated as interest on several special funds of the State. The Treasurer, conforming to a ruling of the Attorney General, had credited this interest to the particular funds specified in the writ. The funds involved are the Common School Fund, State Highway Fund, State Board of Higher Education, Industrial Accident Segregated Fund and Accident Fund. A general statement of the factual background of the case is taken from the Attorney General's brief.

"III.

"* * * Pursuant to statutory directions (ORS 295.020, 295.030 and 295.040) the State Treasurer has designated certain qualified banks to act as state depositories of state moneys.

"* * * In addition, pursuant to the provisions of ORS 295.090 and 295.160, the State Treasurer has designated a bank in Salem to act as the active depository of moneys of the State of Oregon for the purpose of paying the current obligations of the State of Oregon on a daily basis."

"IV.

"* * * Almost all state agencies and officers pursuant to law make deposits of cash receipts, either with the State Treasurer himself in Salem or with the various qualified depository banks located throughout the State of Oregon. Deposits of cash receipts with qualified depository banks are to the credit of the account 'State Treasurer, State of Oregon.'

"* * * The State Treasurer is advised of such deposits on a daily basis by deposit slips forwarded to him by the depository banks receiving the deposits. Such deposit slips indicate the amount of the deposit and the State officer or agency to be credited with such deposit."

\* \* \* \* \*

## "VI.

"As state moneys from all sources are deposited to the credit of the State Treasurer (whether with the State Treasurer directly or to the credit of the account of the State Treasurer with depository banks) the State Treasurer keeps a daily record of the total cash from whatever source standing to the credit of the State of Oregon in the active depository and in the various depository banks throughout the State of Oregon. * * *."

## "VII.

"* * * The daily obligations of the entire State of Oregon (with exceptions not important here) as evidenced by checks and warrants are paid daily out of the active depository. In order to provide sufficient funds to meet the daily disbursements of the State from the active depository, the State Treasurer keeps cash in the active depository and in demand deposits in qualified depositories throughout the State of Oregon. The demand deposits are used to keep the active depository supplied with cash.

"* * * Experience since 1960 has indicated that the State Treasurer must keep on hand daily in the active depository and in demand deposits in qualified depositories approximately fifteen to eighteen million dollars in order to pay the daily obligations of the entire State of Oregon as they occur. This amount is adjusted either upward, or downward, as known circumstances so indicate. In prior years the amounts kept in the active depository, and in demand deposits have been both less than, and in excess of, the above figures.

"* * * The State Treasurer provides cash for the active depository and for demand deposits from daily receipts and from cash balances in the various qualified depository banks.

"* * * No attempt is made to segregate by particular fund or source the moneys going into the

active depository or in demand deposits in qualified depositories. General Fund moneys, Dedicated Fund moneys, Trust Fund moneys and moneys from whatever source (except unemployment compensation funds) are commingled in the account of the State Treasurer in the active depository and in demand deposits in qualified depositories in order to provide sufficient cash to meet the daily cash disbursements of the State of Oregon as a whole.

"* * * No interest is paid to the State of Oregon on funds kept in the active depository or in demand deposits and no such interest has been paid since 1937. For all practical purposes, the interest at issue in these proceedings does not pertain to the active depository or to state moneys kept in demand deposits."

"VIII.

"* * * A portion of the cash in the custody of the State Treasurer not needed for the active depository or for demand deposits is used to purchase securities for dedicated and trust funds such as, for example, the Industrial Accident Fund, the Common School Fund and the University of Oregon Donation Fund. Such investments are known as Designated Fund Investments, and are made when the State agency concerned requests that such investments be made.

"* * * Any interest earned on designated fund investments is credited to the particular fund for which the investments were made. The interest proceeds at issue in these proceedings do not involve designated fund investments."

"IX.

"* * * Approximately 85 per cent of the balance of the cash in the custody of the State Treasurer remaining after the needs of the active depository and demand deposits have been satisfied and the designated fund investments, if any, have been

made, is used, regardless of the source of the moneys, to purchase securities which are known as *Excess Fund Investments.* Such investments have been made under the provisions of ORS 293.705 (4). The remaining balance of the cash in the custody of the Treasurer is placed in time deposits at interest in various qualified depositories throughout the State of Oregon.

"* * * Interest received from excess fund investments or received from time deposits in the past has been uniformly credited to the General Fund under the provisions of ORS 293.760, 293.140 and 295.080 (1)."

Relator's standing to bring this action has not been challenged. We will not consider the question.

Three of the funds involved have constitutional implications. The Common School Fund was created by Section 2, Article VIII of the Oregon Constitution. The Fund was derived from the sale of school lands granted to the state by Congress when Oregon was admitted to the Union. The Section requires that all interest on the funds be credited to the Fund.

The Highway Funds involved are moneys received from various motor vehicle and gasoline taxes. Section 3 of Article IX of the Constitution requires that the "proceeds" of these taxes must be spent for highway purposes. The problem here is to decide if "proceeds" includes the interest that these moneys earn while in the custody of the Treasurer.

The State Board of Higher Education Funds in question consist of moneys realized on the sale of bonds permitted by Article XI F (1) and by Article XI G of the Constitution and of funds accumulated to satisfy the bonds. These constitutional amendments were enacted to loan the State's general credit to bonds issued by the State Board of Higher Education to

finance self-liquidating projects. The proceeds of the bonds are held by the Treasurer pending use of the funds by the Board of Higher Education. The funds were activated and designated as the Higher Education Bond Building Fund and the Higher Education Bond Sinking Fund by ORS 351.450 and 351.460 pursuant to Article XI F (1) and by Chapt. 584 Laws of Oregon 1963 pursuant to the adoption of Article XI G.

The other funds involved in these proceedings were all created and governed by statute. These are designated in these proceedings as the University of Oregon Donation Fund, State Board of Higher Education Donation Fund, and the State Board's Suspense Checking Account, the funds of the State Industrial Accident Commission and of the Public Employees Retirement Fund. How many other statutory funds may have been affected by the opinion of the Attorney General we cannot tell.

■ As to these statutory funds we have no difficulty. The long time approval by the legislature of the interpretation of the fiscal management statutes by the State Treasurer, and of the several Boards and Commissions involved, is persuasive evidence of legislative intent and policy. *Allen v. Multnomah County,* 1946, 179 Or 548, 173 P2d 475. The legislature has not only acquiesced in the administrative interpretation of the statutes; it has, by a 1963 amendment to ORS 295.080, affirmatively directed that certain interest on time deposits be credited to the General Fund. Section 2 (1) (b) Chapter 520, Oregon Laws 1963. This recent action of the legislature answers the argument of the Attorney General that specific statutory provisions, ORS 656.456 (2) for example, control the general statutes relating to interest, ORS 293.760. That the legislature has the power, when not specifically limited by

a Constitutional proscription, to provide for the fiscal management of state funds cannot be doubted.

■ In respect to the statutory funds the peremptory writ will issue directing the State Treasurer to retransfer the interest money to the General Fund.

■ The legislature does not have the same latitude in respect to those funds we have designated as the constitutional funds. Interest on the Common School Fund is controlled by express constitutional direction. We think the interest on the State Highway and State Board of Higher Education Funds becomes a part of the funds by implication.

Article VIII, Section 2 of the Constitution requires that all of the interest and other revenues of the Common School Fund shall be used "exclusively" for the support and maintenance of the common schools. The meaning of that provision requires no exposition.

It is not quite so clear in respect to the other two constitutional funds. The facts presented indicate that the interest attributable to the deposit of these funds with the State Treasurer can be readily segregated out of the common pool of investments made by the Treasurer.

The highway money involved here is derived from gasoline taxes and other vehicle fees and licenses. Prior to 1942 the use of this money was governed by statute. In 1941 the Legislature proposed and at the election of November 3, 1942, the people adopted the amendment to Article IX, Section 3 of the Constitution which restricted the use of this form of revenue to highway purposes. It is apparent that the intent of the people when they adopted the amendment was to guarantee that none of the "proceeds" of the taxes and fees listed in the amendment would be diverted to any other purpose.

In *Lawson v. Baker* (Tex. Civ. App.) 1920, 220 S. W. 260 the Texas Court held that interest became a part of a similar highway fund in Texas and that the constitutional limitation in the Texas Constitution as to the use of the fund prohibited the legislature from diverting the interest away from the fund. We agree with the reasoning and holding of the Texas Court. At 143 ALR beginning at page 1341 is an annotation on the liability of municipalities for interest earned on special funds held by the treasurer of the municipality. The annotators have collected cases relating to interest on the funds of a school district or drainage district, for example, held by a county treasurer. These cases are significant in that they generally hold that interest must follow a special fund and be used for the benefit of the fund or for the purpose for which the fund was created. See particularly *Pomona City School Dist. v. Payne,* 1935, 9 Cal App2d 510, 50 P2d 822. We recognize that in most of these cases the courts are examining statutes not constitutions. The cases are, however, pertinent to our inquiry because a local officer may no more disregard a state statute than a legislature can ignore the constitution of the state.

An examination of all of the authority that can be found which relates to our problem is convincing that the legislature cannot divert interest from these funds.

We have also endeavored to look to the voter's state of mind when the amendments were approved.

It is recognized that the people's approval of the amendment to Article IX, Section 3 provides no actual expression of a will and intent that interest that may be earned by the accumulated revenues controlled by the amendment should accrue to the highway fund.

There is a strong inference, however, that the clear intent of the people to compel the specified revenues to be used for one purpose implies that it would include all of the interest that would accrue during the State Treasurer's holding of the revenues for their eventual use. We so hold.

There are stronger reasons for holding that interest accruing to State Board of Higher Education Funds created as a result of the adoption of Article XI F (1) and XI G should adhere to those funds. A substantial part of the money used to satisfy the bonds authorized by those Articles is derived from fees and charges exacted from students at the several state schools. It would be most improbable that the people, in adopting these amendments, would have intended that any interest earned by the accumulation of these funds would be diverted to other purposes. Interest that would be paid to the General Fund would, indirectly, be the same as diverting the student fees for the benefit of other state purposes. And the bond buyers and holders should have the right to look to all available sources to secure the payment of the bonds. The constitutional permission to issue the bonds would appear to carry with it an obligation to both those who pay the bonds and to those who hold them to use the questioned interest for that purpose.

It seems evident to us that in respect to the three constitutional funds the writ must fail.

It follows that the demurrer to the writ is sustained in part and overruled in part. The special nature of this proceeding does not, of course, require that we apply the rule that a pleading will be sustained if any part of it states a cause of action. A peremptory writ will issue in respect to the statutory funds specified in the opinion.

Peter S. Herman, Assistant Attorney General and Robert Y. Thornton, Attorney General, Salem, for the motion.

Before McAllister, Chief Justice, and Sloan, O'Connell, Goodwin, Denecke, Holman and Lusk, Justices.

PER CURIAM.

■ The parties have asked for clarification of the opinion filed in this case. They ask if interest earned on State Highway Funds before the adoption of the

amendment to Section 3, Article IX, of the Oregon Constitution should be credited to the General Fund. Prior to that date the fund was created and governed by statute.

Secondly, it is asked if interest earned on all of the money in the Higher Education's suspense checking account should be credited to the General Fund. This account or fund was also created and is controlled by statute.

The statement in the opinion that the legislature had undoubted power to provide for the fiscal management of statutory funds makes it clear that the answer to both questions is "yes."